USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___08/16/2021___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
CLAYTON T. JOHNSON,                          :
                                             :
                              Plaintiff,     :
                                             :        20-cv-05913 (ALC)
              -against-                       :
                                             :        **OPINION & ORDER**
                                             :
PETER WACHTEL, D.O., ET AL.,                 :
                                             :
                              Defendants.    :
------------------------------------------------------------------- x

**ANDREW L. CARTER, JR., District Judge:**

Plaintiff Clayton T. Johnson (hereinafter, "Plaintiff" or "Mr. Johnson") brings this action under 42 U.S.C. § 1983 against Peter Wachtel, D.O., Adam Litroff, D.O., Edna Katz, M.D., Aslam Kadri, M.D., City of New York, New York City Health and Hospitals Corporation ("NYCHHC"), and John and Jane Doe Medical Providers 1-10 (collectively, "Defendants"). Plaintiff alleges violations of his constitutional rights under the Fourteenth Amendment, specifically, deliberate indifference by Peter Wachtel, D.O., Adam Litroff, D.O., Edna Katz, M.D., and Aslam Kadri, M.D. (collectively, "Moving Defendants"). Plaintiff also asserts state law claims for negligent hiring, training, and supervision against the City of New York and NYCHHC and medical malpractice against all Defendants.[1] The Moving Defendants moved to dismiss all claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the Moving Defendants' motion is **DENIED**.

---

[1] Initially, Plaintiff also asserted a *Monell* claim against the City of New York but dropped that claim in their response to Defendants' pre-motion conference letter. *See* ECF No. 36 at 1; *see also supra* at pp. 7-8.

## BACKGROUND

### I.     Factual Background[2]

Plaintiff was arrested by the NYPD on or about May 3, 2019 and incarcerated at Rikers Island as a pre-trial detainee. Compl. ¶¶ 22-24, ECF No. 9. On the morning of May 7, 2019, an unknown assailant struck Plaintiff from behind, resulting in loss of consciousness and trauma to his head and neck. *Id.* ¶ 26. At around 10:45 A.M., Blessing Ezc, RN, and Frantz Nicholas, PA, responded to an emergency call and found Plaintiff sitting on the dining room floor against the wall. *Id.* Plaintiff explained that he had been assaulted and could not get up. *Id.* ¶ 27. He was lifted onto a stretcher and taken to the jail clinic. *Id.* The PA examined Plaintiff and he was given Tylenol and taken back to his cell around 12:20 P.M. *Id.* ¶ 28. Later that day, Plaintiff remained unable to move his extremities and was taken to the clinic at around 6:53 P.M. *Id.* ¶¶ 29-30. He received a medical assessment by a physician, who physically cleared Plaintiff given some movements in Plaintiff's extremities. *Id.* ¶ 30. At this time, Plaintiff was referred to mental health providers for psychiatric evaluation. *Id.*

The next day, May 8, 2019, Plaintiff sought treatment for continued weakness in his extremities. *Id.* ¶ 31. Around 12:00 P.M., Elsie Norgaisse, LPN, responded to a medical emergency call from Plaintiff's housing area and found him in his cell "on prone position with [complaints of] weakness." *Id.* Plaintiff voiced that he wanted to go to "Nursing Home" as he could not feed himself. *Id.* Plaintiff was transferred to a stretcher and taken to the clinic. *Id.* At the clinic, Plaintiff received medical treatment by Defendant Katz who noticed the lack of movement in Mr. Johnson's extremities but noted "[i]ntact sensitivity of extremities." *Id.* ¶¶ 32-

---

[2] When determining whether to dismiss a case, the court accepts as true all well-pleaded factual allegations in the Complaint and draws all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). Pursuant to that standard, this recitation of facts is based on Plaintiff's Complaint. *See* ECF No. 9.

33. Plaintiff also told Defendant Katz that "he did not urinate for the last [two] days." *Id.* ¶ 35. Defendant Katz is alleged to have denied further evaluation, testing, and treatment as to Plaintiff's limited mobility and as having failed to provide proper diagnosis or treatment regarding Plaintiff's complaint of worsening back pain. *Id.* ¶¶ 33-34. Instead, Defendant Katz gave Plaintiff milk to drink and sent him back to his cell. *Id.* ¶ 35. Defendant Katz subsequently notified "Urgicare" of Plaintiff's condition.[3] *Id.* ¶ 36. That same day, Plaintiff was also examined by Defendant Litroff. *Id.* ¶ 39. Defendant Litroff noted that "Patient states can't move legs or hand," but stated that there was "no evidence of trauma/infection" and concluded Plaintiff was "[m]alingering" and required a mental health evaluation. *Id.* ¶ 40.

On May 10, 2019 at around 2:00 P.M. Plaintiff was taken to the clinic once again after he made another medical emergency call from his cell, stating that he could not walk or feed himself without assistance. *Id.* ¶ 41. At the clinic, he was examined by Asha Kumar, M.D., who noted Plaintiff's limited range of motion and gait assessment exams limited by pain. *Id.* ¶¶ 42-43. Dr. Kumar recommended imaging studies such as thoracic and lumbar spine x-rays. *Id.* ¶ 43. No imaging studies were performed at the time. *Id.* ¶ 44. Dr. Kumar called the Urgicare team and spoke with Defendant Wachtel, who suggested that Plaintiff be referred for a mental health evaluation. *Id.* ¶ 45. Later that day, Plaintiff was seen for a psychiatry evaluation. *Id.* ¶ 49. Plaintiff told the psychiatrist that he needed him to help him and complained of not being able to move or care for himself. *Id.* The psychiatrist wrote: "Although this can be of psychosomatic

---

[3] Upon information and belief, "Urgicare" refers to "a group of physicians . . . who are responsible for determining, among other things, which detainees or inmates warrant a transfer to an outside hospital or medical facility." Compl. ¶ 37. Upon information and belief, Defendants Wachtel, Litroff, and Kadri belong to this group of physicians. *Id.* Additionally, upon information and belief, Urgicare physicians are "authorized to deny an inmate transfer for evaluation or treatment at an outside hospital, even when they do not personally examine the inmate and when the doctor who performed the in-person examination recommends evaluation or treatment at a hospital." *Id.* ¶ 38.

nature, medicine must r/o [rule out] any medical etiologies for possible medical complaints." *Id.* The psychiatrist placed Plaintiff on suicide watch as a precautionary measure. *Id.* ¶ 50.

The next day, May 11, 2019, Plaintiff asked to be taken off suicide watch and explained that his hygiene and eating problems, as well as other symptoms, were not psychiatric in nature. *Id.* ¶ 51. However, Plaintiff was kept on suicide watch and did not receive any additional medical work-up. *Id.* ¶ 52. Around 12:45 P.M., Plaintiff made a medical emergency call for paralysis and was transferred by stretcher from his cell to the medical clinic. *Id.* ¶ 53. The nurse noted that Plaintiff was "poorly kept, smells of urine and noticed his pants wet." *Id.* ¶ 54. The nurse also noted that "Per inmates in the housing area they have been the ones caring fo[r] him in the past few days" because Plaintiff was "unable to walk and feed himself." *Id.* ¶ 55. At the clinic, Plaintiff was seen by James Uhrig, M.D, who observed that Plaintiff could only move his head and was "[f]luid deplete from not drinking." *Id.* ¶ 56. At around 3:00 P.M. Dr. Uhrig discussed the case with Defendants Kadri and Litroff. *Id.* ¶ 57. Defendant Litroff opined that there were "no signs of trauma or spinal injury/compression" even though at that point no further tests had been conducted. *Id.* ¶ 58. Defendant Kadri agreed and instructed Dr. Uhrig to keep Plaintiff at the clinic. *Id.* ¶ 59. Dr. Uhrig followed Defendant Kadri's instruction and kept Plaintiff at the clinic. *Id.* ¶ 60. The same nurse who had evaluated Plaintiff earlier that day wrote that "MD James again ask if pt [patient] could be sent out to hospital for further evaluation. [However] MD James stated Urgi[care] makes the call if pt can go to hospital and as per Urgi[care] MD Lit[r]off pt should not be sent out. Will continue to monitor pt in clinic." *Id.* ¶ 61.

Defendant Kadri examined Plaintiff at around 7:35 P.M. *Id.* ¶ 64. His notes state: "Signed out to this provider the patient who was in emergency because he cannot move any of his extremity. Gives history of trauma says few days back someone struck him from behind & since

cannot move any extremity . . . . When asked what do you want patient wants to go to hospital & been admitted." *Id.* Defendant Kadri again concluded that there was "no sign of trauma" and opined that "Most likely patient is malingering may also be Conversion/Somatization disorder" and referred him to a psychiatrist. *Id.* ¶¶ 65-66. Defendant Kadri sent Plaintiff back to his cell without treatment. *Id.* ¶ 68.

The next morning, May 12, 2019, at around 6:48 A.M., an unknown member of the nursing staff at Plaintiff's housing area requested a medical emergency call, reporting that Plaintiff could not move and that he had not eaten for days. *Id.* ¶ 69. Lisa Alleyne-Moore, NP, responded to the call and observed Plaintiff lying on the bench in his pen, his feet crossed at the ankles, and having urinated on himself. *Id.* ¶ 70. When Plaintiff was instructed to uncross his feet, he responded that he could not because he was paralyzed. *Id.* NP Alleyne-Moore discussed the case with Defendant Litroff, who recommended they await a psychiatry evaluation. *Id.* ¶ 71. Defendant Litroff reported that there were "no physical findings concerning for organic cause." *Id.* ¶ 72. He noted that there was some residual sensation and movement in Plaintiff's extremities. *Id.* When Plaintiff returned to his cell, he was seen by a psychiatrist who noted that "Patient states he needs to be transferred to a hospital or nursing home as he is paralyzed, unable to function in jail settings. Patient is not endorsing any mental health problems or concerns." *Id.* ¶ 73.

The next day, May 13, 2019, Emawattie Jagan, RN, responded to a medical emergency call and found Plaintiff on the floor of his cell unable to walk. *Id.* ¶ 76. Plaintiff smelled of urine and feces and his clothes were wet. *Id.* He was dehydrated to the point that his lips were cracked. *Id.* He was taken to the clinic and seen by Azmat Hasan, M.D., who observed that Plaintiff had been unable to void urine for four days and had his pants soiled with feces. *Id.* ¶¶ 76-77. Dr.

Hasan diagnosed Plaintiff with obstructive and reflux uropathy and dehydration. *Id* ¶ 77. He finally referred Plaintiff to Hospital EMS for a higher level of care and Defendant Litroff signed off, stating that Plaintiff had been "worsening over days, dehydrated/tachycardic, not resolving w/ conservative treatment." *Id.* ¶ 79.

At that point, Plaintiff was transferred to Bellevue where it was confirmed that Plaintiff was suffering from a spinal injury resulting in quadriparesis and urinary/fecal retention of several days' duration. *Id.* ¶ 80. Plaintiff was found to have held at least one liter of urine in his bladder, causing obstructive uropathy and acute kidney injury. *Id.* ¶ 81. He was also found to have a large sacral decubitus ulcer with eschar on his buttocks, indicative that Plaintiff had likely not been moving in the last few days. *Id*. Plaintiff was also severely malnourished and dehydrated. *Id.*

Bellevue physicians ordered a CT scan and MRI of the cervical spine, the former which was concerning for possible cord compression in setting of recent trauma, and the latter which demonstrated cervical contusion in setting of central canal stenosis. *Id.* ¶ 84. Plaintiff was determined to require an urgent anterior cervical discectomy and fusion for cervical spinal cord contusion and edema, which was causing bilateral upper extremity flaccid paralysis and dense bilateral lower extremity paraparesis. *Id.* ¶ 85. On May 14, 2019, Plaintiff underwent an anterior cervical discectomy and fusion to decompress and stabilize the cervical spine. *Id.* ¶ 87. However, Bellevue physicians noted that Plaintiff was "not likely to regain function" even with the surgery. *Id.* ¶ 86.

As of May 20, 2019, Plaintiff was transferred from Bellevue surgical ICU services to acute rehabilitation services. *Id.* ¶ 88. He remained in a cervical collar with no movement in bilateral upper extremities and weak withdrawal reflex in bilateral lower extremities. *Id.* His post-operative recovery was complicated by acute renal insufficiency, sepsis, edema challenging

overall swallow function (i.e., dysphagia), urinary retention, stage four sacral ulcer, as well as a pulmonary embolism. *Id.* ¶ 89. The last two conditions were, upon information and belief, due to Plaintiff's prolonged positioning on his back while under Defendants' care. *Id.* ¶ 90. Plaintiff also remained on a PEG tube for nutrition and hydration and was treated for severe malnutrition. *Id.* ¶ 91.

After the surgery, Plaintiff remained hospitalized at Bellevue for about six months until on or about November 15, 2019, receiving continuous care for his spinal cord injury and other injuries.[4] *Id.* ¶ 92. For most of his time at Bellevue, Plaintiff was reported to be non-ambulatory. *Id.* ¶ 93. Complete assistance was needed for activities of daily living such as rolling his body, grooming, and dressing. *Id.* He required frequent nursing care and daily dressing changes to help the sacral wound heal. *Id.* He also required catheterization multiple times a day to urinate and assistance to have a bowel movement. *Id.* The majority of his days were spent in bed, and eventually, part of his days were spent in a wheelchair. *Id.*

As of the filing of the Complaint, Plaintiff has unsteady ambulation due to spinal injury and requires a cane and/or wheelchair. *Id.* ¶ 96. He also complains of continued lack of mobility in his upper extremities, particularly in his hands and fingers. *Id.* Upon information and belief, Plaintiff also suffers from other permanent neurological injuries and deficits. *Id.* ¶ 97.

## II.    Procedural Background

Plaintiff commenced this action on July 29, 2020. ECF Nos. 1, 9. On October 13, 2020, Defendants filed a pre-motion conference letter in connection with their anticipated motion to dismiss Plaintiff's Complaint. ECF No. 35. Plaintiff responded on October 16, 2020. ECF No. 36. On November 12, 2020, the Court denied Defendants' request for a pre-motion conference,

---

[4] Plaintiff remained in DOC's custody until on or about September 20, 2019 and subsequently remained at Bellevue as a civilian. Compl. ¶ 92.

but granted Defendants leave to file a motion to dismiss. ECF No. 37. Defendants filed their motion to dismiss and accompanying memorandum of law on December 3, 2020 ("Defs.' Mot."). ECF Nos. 38, 40. On December 17, 2020, Plaintiff filed his opposition brief ("Pl. Opp.") and on December 24, 2020, Defendants filed their reply brief in further support of their motion to dismiss ("Defs.' Reply").

Defendants' motion is deemed fully briefed. After careful consideration, Defendants' motion to dismiss is hereby **DENIED** in its entirety.

**STANDARD OF REVIEW**

When considering a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

### I.     Plaintiff Has Adequately Pleaded His Deliberate Indifference Claim

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (internal citation omitted). Official custodians include jail physicians. *See, e.g.*, *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). To establish a claim for deliberate indifference, a plaintiff must satisfy (1) an "objective prong," showing that the violations were "sufficiently serious to constitute objective deprivations of the right to due process" and (2) a "mental element prong," showing that "the officer acted with at least deliberate indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

### A.  Objective Prong

The first element of a deliberate indifference claim is objective and requires a "sufficiently serious" deprivation, in other words, a deprivation that presents a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Lloyd v. Lee*, 570 F. Supp. 2d 556, 566 (S.D.N.Y. 2008) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert denied*, 513 U.S. 1154 (1995)) (internal quotation marks omitted).[5] In assessing whether this element is met courts consider (1) "whether there was an actual deprivation of adequate medical care;" and (2) "whether the inadequacy in medical care is sufficiently serious." *Id.* (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)) (internal quotation marks omitted). Determining whether the inadequacy in medical care is "sufficiently serious" "requires the court

---

[5] This analysis conducted under this prong is the same under both the Eighth and Fourteenth Amendments. *See Darnell*, 849 F.3d at 30; *Lloyd*, 570 F. Supp. 2d at 570.

to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (quoting *Salahuddin*, 467 F.3d at 280) (internal quotation marks omitted). "If the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280 (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Id.* More specifically, the inquiry focuses on "the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Carpenter*, 316 F.3d at 186 (citing *Chance v. Armstrong*, 143 F.3d 698, 702-03 (2d Cir. 1998)). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal citations and quotation marks omitted).

The Court concludes that Plaintiff has adequately pleaded that he suffered a "sufficiently serious" deprivation when Moving Defendants refused to conduct any further evaluations/tests on Plaintiff or transfer him to Bellevue, despite the fact that Plaintiff had been assaulted and subsequently reported being in pain and unable to walk and feed himself. The Court can reasonably infer from these allegations that Plaintiff was suffering from a condition of urgency that produced degeneration and extreme pain as evidenced by Plaintiff's allegations that when he was finally transferred to Bellevue, he was found to have held at least one liter of urine in his bladder, causing obstructive uropathy and acute kidney injury, to have a large sacral decubitus ulcer with eschar on his buttocks, indicative that Plaintiff had likely not been moving in the last

few days, and to be severely malnourished and dehydrated. Compl. ¶ 81. Moreover, an MRI and

CT scan revealed that Plaintiff needed urgent surgery to treat a spinal injury. *Id.* ¶¶ 84-85. These

facts, and the fact that Moving Defendants did not conduct further evaluations/tests on Plaintiff

and/or transfer Plaintiff to Bellevue for a period of six days, despite Plaintiff complaining of pain

and paralysis, despite multiple physicians recommending further tests and/or transfer to Bellevue

and despite Plaintiff having been found in his cell having urinated himself twice, support the

conclusion that Plaintiff was deprived of adequate medical care and that this deprivation was

sufficiently serious. *See Lloyd*, 570 F. Supp. 2d at 566 (liability may arise if a prison official fails

to respond reasonably to an inmate's medical condition).

The Court finds Moving Defendants' arguments that Plaintiff's rights were not violated

because (1) he was seen and evaluated numerous times by medical personnel, Defs.' Mot. at 7-8,

(2) his claim rests on a subjective disagreement with his doctors, *id.* at 8, and (3) a delay in

treatment does not violate the Constitution, *id.* at 9, are meritless. Moving Defendants' assertion

that being seen and evaluated by medical personnel precludes a deliberate indifference claim

misunderstands the inquiry. The question here is whether Plaintiff suffered a deprivation of

*adequate* medical care, *see Lloyd*, 570 F. Supp. 2d at 566, not whether he received medical

treatment at all. *See also Salahuddin*, 467 F.3d at 280 (distinguishing standard between not

receiving treatment at all and receiving some); *Carpenter*, 316 F.3d at 186 (same). Failure to

respond *reasonably* to an inmate's medical condition may result in liability even where an

inmate is seen and/or evaluated by medical personnel. *Lloyd*, 570 F. Supp. 2d at 566; *see also*

*Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) (allowing case to go to trial on deliberate

indifference claim even where defendant personally saw and treated plaintiff on multiple

occasions during which plaintiff complained about pain), *cert. denied*, 513 U.S. 1154 (1995);

*Davis v. McCready*, No. 14-cv-6405, 2016 WL 796847, at \*4 (S.D.N.Y. Feb. 22, 2016) (finding plaintiff satisfied objective prong even where he was seen by medical personnel on thirteen different occasions and provided with a cane, Naprosyn, and Tylenol); *Richardson v. Corr. Med. Care, Inc.*, 17-cv-0420, 2018 WL 1580316, at \*1-2, 5 (N.D.N.Y. Mar. 28, 2018) (finding objective prong had been satisfied where plaintiff complained of chest pain and was evaluated by jail physicians and other medical staff, but was only given Tylenol instead of his prescribed medication despite his history of heart problems).

As to Moving Defendants' other arguments, this is not a case about Plaintiff's mere disagreement with Moving Defendants' prescribed course of action, but rather about whether he received adequate medical care given the circumstances. And, as the cases cited above demonstrate, a delay in care can violate the Constitution. *See supra* pp. 11-12; *Quinones v. City of New York*, No. 16-cv-0985, 2017 WL 775851, at \*2-3 (S.D.N.Y. Feb. 28, 2017) (denying motion to dismiss plaintiff's deliberate indifference claim where plaintiff's treatment was delayed for a day, but plaintiff was in extreme pain during that time), *adopting report and recommendation*, 2017 WL 1322205 (S.D.N.Y. Jan. 6, 2017); *Thomas v. Tisch*, No. 08-cv-0400, 2009 WL 701009, at \*9 (E.D.N.Y. Mar. 11, 2009) (denying motion to dismiss plaintiff's deliberate indifference claim where plaintiff's treatment was delayed by less than a day). Plaintiff has adequately alleged that the medical care he received was inadequate. Further, the Court can draw the inference that the harm Plaintiff suffered resulted from Moving Defendants' delay in treatment.

Therefore, the Court concludes that Plaintiff has satisfied the objective prong of his deliberate indifference claim.

### B.  Mental Element Prong

To satisfy the mental element prong of a deliberate indifference claim, a plaintiff "must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. "In other words," the court explained, "the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively." *Id.* Nevertheless, "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence." *Id.* at 36.

The Court concludes that Plaintiff has satisfied this prong at the motion to dismiss stage. As alleged, the Court can infer that Moving Defendants acted with more than mere negligence given that they ignored multiple physicians' recommendations for further medical evaluations/ transfer to Bellevue despite Plaintiff's continued complaints of not being able to walk or feed himself and even after he was found in his cell having urinated himself twice. As alleged, it is plausible that they knew or should have known that Plaintiff's condition posed an excessive risk to his health or safety, especially considering that Plaintiff had been assaulted just a few days prior. The Court has considered the arguments in regard to each of the individual Moving Defendants and has found them to be without merit.

Thus, Plaintiff has satisfied the mental element prong of his deliberate indifference claim.

### II.    Plaintiff's Remaining State Law Claims

Moving Defendants argue that because Plaintiff's federal claims against Moving Defendants should be dismissed for failure to state a claim under 42 U.S.C. § 1983 then the Court should decline supplemental jurisdiction over Plaintiff's remaining state law claims. For

the reasons discussed above, Moving Defendants' motion to dismiss Plaintiff's deliberate

indifference claim is denied. Because Plaintiff still has viable federal claims, the Court need not

reach Moving Defendants' supplemental jurisdiction argument.

## CONCLUSION

For the reasons herein, Defendants' motion to dismiss is **DENIED** in its entirety. The

Clerk of Court is respectfully directed to terminate ECF No. 38. The case will be referred to the

assigned Magistrate Judge for general pretrial forthwith.

**SO ORDERED.**

**Dated: August 16, 2021**
        **New York, New York**

_____
        **ANDREW L. CARTER, JR.**
        **United States District Judge**

14